Minute Order Form (06/97)



# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Paul E. Plunkett | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 3400 | **DATE** | 6/21/2004 |
| **CASE TITLE** | Jerome Johnson vs. Russell Stanley Corporation | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Date for status and ruling on motion for summary judgment of 7/15/04 is stricken. There is no genuine issue of material fact on any of the claims plaintiff asserts against defendant Russell Stanley Corporation, which is entitled to judgment as a matter of law. Defendant's motion for summary judgment (27-1) is granted. Court enters judgment in favor of defendant Russell Stanley Corporation and against plaintiff Jerome Johnson. This is a final and appealable order.
Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | JUN 2 2 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | 30 |
| | Copy to judge/magistrate judge. | | | |
| CW courtroom deputy's initials | | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JEROME JOHNSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 03 C 3400 |
| ) | Paul E. Plunkett, Senior Judge |
| RUSSELL-STANLEY CORPORATION, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Jerome Johnson has sued Russell-Stanley Corporation ("RSC") for its alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq. and state law. RSC has filed a Federal Rule of Civil Procedure ("Rule") 56(c) motion for summary judgment. For the reasons set forth below, the motion is granted.

### The Legal Standard

To prevail on a summary judgment motion, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). At this stage, we do not weigh evidence or determine the truth of the matters asserted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. Michas v. Health Cost Controls

of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. Id.

## Background[1]

Plaintiff, an African-American, was hired by Smurfit, RSC's predecessor, in the fall of 1990. (Def.'s LR 56.1(a) Stmt. ¶ 6.) In 1997, Smurfit sold to RSC the Addison, Illinois plant where plaintiff worked. (Id. ¶ 2.) After the sale, plaintiff became an RSC employee. (Id. ¶ 6.)

RSC makes plastic drums that are used in, among others, the chemical and pharmaceutical industries. (Id. ¶ 1.) The drums made at the Addison plant often carry hazardous materials, which the Secretary of Transportation defines as materials capable of posing an unreasonable risk to health and safety when transported in commerce. (Id. ¶ 3.) The testing and quality of these drums is regulated by federal law. (Id. ¶ 14.)

RSC has a set of standard operating procedures ("SOPs") for testing its drums to ensure that all legal requirements are met. (Id. ¶ 16.) The SOPs require that certain quality tests be performed on all drums and that others be performed on a sample of drums from each production line. (Id. ¶ 17.) The SOPs also require that the tests be described and the results be recorded on forms kept at the facility. (Id. ¶ 18.)

During the relevant time, plaintiff worked as a quality control technician. (Id. ¶ 8.) Plaintiff reported to the quality supervisor, Jim Haskins, who reported to the quality manager, initially, Greg DeVries, and later, Anant Shah, who reported to the plant manager, Mark McGrew. (Id. ¶¶ 5, 10-13.)

---

[1]Unless otherwise indicated, the following facts are undisputed.

As a quality control technician, plaintiff was required to perform three kinds of tests on drums pulled from different machines each shift: an open head drop test, a tight (or closed) head drop test and a hydrostatic test. (Id. ¶¶ 25, 28.) Plaintiff was expected to perform all three tests within a few days of a drum's production. (Id. ¶ 29.) The SOPs required plaintiff to sign, date and record the results of each test he performed on a quality test report ("QTR"). (Id. ¶¶ 31-33.)

The open head drop test was the most time-consuming of the tests plaintiff was required to run. (Id. ¶ 30.) Before he could run such a test, plaintiff had to take a drum from the freezer, where drums were left to cure, fill it with frozen regrind (ground up plastic drums) and stones, put the lid and ring on the drum and seal the drum shut. (Id. ¶¶ 34-35.) Then, using the drop tester machine, plaintiff would lift the drum four feet, three inches off the ground, turn the drum to a forty-five degree angle and drop it. (Id. ¶ 36.) The drum passed the test if the lid did not come off, the side seam did not crack and the regrind and stones did not spill out. (Id. ¶¶ 37-38.) Regardless of the outcome, all drums are sent to the grinding room after being tested. (Id. ¶¶ 40-41.)

After an open head drum is drop tested, it shows signs of impact on the sides, the lid and the ring. (Id. ¶ 42.[2]) Over time, the drum may return to its original shape, but the ring and lid will remain damaged. (Id.; Pl.'s LR. 56.1(b)(3)(A) Stmt. ¶ 42.)

In November 2002, McGrew noticed seventy-one untested open head drums near plaintiff's work area. (Def.'s LR 56.1(a) Stmt. ¶ 45.) Some of them had production dates of July, August and September 2002, which meant they were probably already in the hands of RSC customers. (Id. ¶ 46.) McGrew told plaintiff that he had two weeks to test the drums, and authorized overtime for him to

---

[2] Plaintiff contends that damage was possible, but not inevitable. (See Pl.'s LR 56.1(b)(3)(A) Stmt. ¶ 42.) But the deposition testimony he cites for that proposition does not support his contention.

do it. (Id. ¶ 47.) As of Friday, November 22, 2002, it appeared to Haskins, plaintiff's immediate supervisor, that plaintiff had not tested any of the backlogged drums. (Id. ¶ 49.) Consequently, on Monday November 25, 2002, plaintiff was given a written warning for failure to follow instructions, substandard work and failure to comply with federal regulations for drum tests. (Id. ¶ 50.) The warning said that plaintiff would be subject to "disciplinary actions up to and including termination," if he failed to follow directions in the future. (Id., Tab V(C), 11/25/02 Disciplinary Report.)

The following day, November 26, 2002, Haskins discovered six QTRs that plaintiff had signed and dated Wednesday, November 27, 2002. (Id. ¶ 52.) In the grinding room, Haskins found four of the six drums that corresponded to the QTRs. (Id. ¶¶ 55-56.) Haskins believed that the drums had not been tested because they showed no signs of damage. (Id. ¶ 57.) Haskins, recognizing their importance, moved the drums to the front office of the plant for safekeeping. (Id. ¶ 135.)

Haskins discussed the situation with Shah, and the two concluded that plaintiff had not tested the drums, had falsified records and should be suspended for three days without pay. (Id. ¶¶ 59-60.[3]) The suspension started Wednesday, November 27, 2002 and continued through Tuesday, December 3, 2002. (Id. ¶ 61.)

On Monday, December 2, 2002, McGrew met with Haskins and Shah, reviewed the post-dated QTRs that Haskins had found and examined the four drums that corresponded to the paperwork. (Id. ¶¶ 66-67.) Like Haskins and Shah, McGrew concluded that the drums had not been

---

[3]Plaintiff argues that any information relating to Shah should be stricken because it is hearsay. But because plaintiff reports the results of Haskins' meeting with Shah, not the statements Shah made at that meeting, the hearsay rule is not implicated.

-4-

tested. (Id. ¶¶ 68-69.) Together they decided that plaintiff's actions warranted termination. (Id. ¶ 71.) Later that day, McGrew discharged plaintiff. (Id. ¶ 73.)

On December 5, 2002, plaintiff filed a grievance with his union contesting his termination. (Id. ¶ 80.) During the union's investigation into the grievance, plaintiff and his union representative, Karl Sarpolis, Jr., examined the four allegedly untested drums. (Id. ¶ 82.) The union concluded that plaintiff had "pre-dated drum tests," but requested that he be reinstated because of his years of service with the company. (Id., Tab V(I), McGrew Decl., Att. A, 1/13/03 Letter to McGrew from Sarpolis.)

At some point after December 2002, the four drums that Haskins had placed in the front office disappeared. (Id. ¶ 136.) The company has not been able to find them since. (Id.)

Plaintiff says that he did test the drums, as he was instructed, and merely wrote the wrong date on the QTRs. (Id. ¶ 88.) He contends that his race, not his conduct on the job, motivated his termination.

### Discussion

In Count I of his second amended complaint, plaintiff alleges that RSC terminated and failed to promote him because of his race in violation of Title VII. It is undisputed, however, that plaintiff did not raise the failure to promote claims in his EEOC Charge. (Pl.'s LR 56.1(b)(3)(A) Stmt. ¶¶ 122-25.) Thus, RSC says, he may not pursue them now.

The Court agrees. "As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in [his] EEOC charge." Cheek v. Western & S. Life Ins. Co., 31 F.3d 497, 500 (7th Cir. 1994). A claim falls within the scope of an EEOC charge only of it is "'like or

-5-

reasonably related to the allegations of the charge and grow[s] out of such allegations.'" Id. (quoting Jenkins v. Blue Cross Mut. Hosp. Ins., Inc., 538 F.2d 164, 167 (7th Cir. 1976)). Plaintiff's failure to promote claims are not like or reasonably related to his termination claim. Cf. Conley v. Village of Bedford Park, 215 F.3d 703, 710 (7th Cir. 2000) (stating that claim for discriminatory suspension is not like or reasonably related to failure to promote claim). Plaintiff cannot, therefore, pursue those claims here.

We turn now to the termination claim. To defeat RSC's motion on that claim, plaintiff must present some direct evidence of RSC's discriminatory intent or comply with the indirect, burden-shifting method of proof articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Cheek v. Peabody Coal Co., 97 F.3d 200, 203 (7th Cir.1996). Plaintiff relies only on the former method, saying that RSC's discriminatory intent can be inferred from a "mosaic" of circumstantial evidence. That evidence includes his satisfactory work performance the year prior to his termination, the union's recommendation that he be reinstated, the racist comments of his supervisors, the decline in the percentage of African-American employees in RSC's blow mold department over a five-year period, RSC's termination of two other African-American employees for falsifying records and plaintiff's testimony that he simply misdated the contested QTRs. Unfortunately for plaintiff, the pieces of this mosaic do not paint a picture of discrimination.

The first bit of evidence that plaintiff says suggests discrimination is the "good" evaluation he received from Haskins in 2001. That evaluation, however, was dated April 6, 2001 and related to his job performance from August 2000 to April 2001. (See Pl.'s LR 56.1(b) Stmt., Tab V(4).) Plaintiff's termination occurred in December 2002, nearly two years after he received that evaluation. The fact that plaintiff performed satisfactorily in late 2000 and early 2001 does not

suggest that his termination at the end of 2002 was motivated by his race. See, e.g., Karazanos v. Navistar Int'l Transp. Corp., 948 F.2d 332, 336 (7th Cir. 1991) (stating that court "must focus . . . upon [plaintiff's] performance at the time of his termination").

Similarly unavailing is the union's recommendation that plaintiff be reinstated. Though the union did make that request, it did not do so because it believed Johnson had been wrongly accused of misconduct. On the contrary, after "conduct[ing] a through [sic] investigation" into the allegations, the union admitted that plaintiff had "pre-dated drum tests," which, the union said, demonstrated "very poor judgement on his part." (Def.'s LR 56.1(a) Stmt., Tab V(I), McGrew Decl., Att. A, 1/13/03 Letter to McGrew from Sarpolis.) Though the union recognized that plaintiff's conduct "could cause serious consequences to him and the Company," it asked RSC to reinstate him because of his "past record, his length of service . . . and . . . to build upon the good relationship the Company and the Union have established." (Id.) Rather than supporting plaintiff's discrimination claim, the union's reinstatement request actually refutes it.

Plaintiff also says that certain comments his supervisors made reveal their racial animus. Specifically, he says that Haskins called him an "SOB," DeVries called him a "stupid ass" and McGrew, during a union negotiation, said he wanted to get rid of all of "you people" or "SOBs" who worked for Smurfit. Though not flattering, the comments made by Haskins, DeVries and McGrew have no apparent racial connotations.

Even if they did, the comments would raise an inference of discrimination only if they were made "around the time of" and "in reference to" plaintiff's termination. Gorence v. Eagle Food Ctrs., Inc., 242 F.3d 759, 762 (7th Cir. 2001). They were not. McGrew's comment was made during a union negotiation that occurred seven months before plaintiff was terminated. (Pl.'s LR 56.1(b)

-7-

Stmt., Tab IV, Johnson Dep. at 135-36.) Similarly, Haskins' comment was made in the summer of 2002, six months before plaintiff was fired. (Id. at 130-31.) And plaintiff has offered no evidence to establish when DeVries' comment, which was made in reference to plaintiff's performance of a needless and time-consuming task, was made. (Id., Tab IV(D), DeVries Dep. at 42-44.) Thus, these comments would not bolster plaintiff's case, even if they had racial overtones.

Equally unhelpful are the statistics on the racial makeup of the RSC blow mold department that plaintiff offers. In 1999, plaintiff says, 80% of the company's blow mold department employees were African-American, 10% were Hispanic and 10% were white. Today, 40% of the employees of that department are African-American, 40% are Hispanic and 20% are white. In plaintiff's view, those numbers support the inference that RSC has an anti-black animus.

There are several problems with this argument. First, those numbers are not really statistics at all. Rather, they are what McGrew characterized as "an absolute guess" of the racial composition of the blow mold department. (Id., Tab IV(C), McGrew Dep. at 35-37.) Second, plaintiff compares the 1999 workforce to the 2004 workforce, but provides no description of the workforce in 2002, the year he was discharged. Thus, we have no way of knowing whether the purported changes occurred before or after plaintiff's termination. Finally, even if there was a dramatic decrease in the number of African-American employees around the time of plaintiff's discharge, that fact would be meaningless without evidence about the context of that change. Were the black employees terminated or did they leave voluntarily? What were the retirement rates of each racial group? What was the racial composition of the relevant labor market during that period? What was the racial composition of the applicant pool during that period? Absent evidence that negates the many non-

-8-

discriminatory reasons that could account for the workforce change, plaintiff's "statistical evidence" is useless.

Plaintiff gets no further with his next bit of evidence: RSC's termination of two other African-American employees for falsifying records. Without some evidence about the dates, decision makers and circumstances of those terminations, and plaintiff has provided none, the mere fact that they occurred proves nothing at all.

Finally, plaintiff says that discriminatory intent can be inferred from his testimony that the conduct that prompted his discharge, falsification of the QTRs, never happened. In other words, plaintiff says his testimony that he mis-dated the reports suggests that RSC's reason for terminating him was a pretext for discrimination.

But the question is not whether plaintiff did, in fact, lie on the QTRs, but whether RSC believed that he had. Jackson v. E.J. Brach Corp., 176 F.3d 971, 984 (7th Cir. 1999) ("[I]f [the employer] honestly believed in the nondiscriminatory reasons it offered, even if the reasons are foolish or trivial or even baseless, [the employee] cannot prevail.") (internal quotation marks and citation omitted). Without more – evidence that the disputed drums were obviously damaged from testing or testimony from another employee who saw plaintiff test the drums on November 23, 2002, for example – plaintiff's testimony that he performed the tests, but misdated the reports, suggests that RSC was mistaken, not that it lied.

In fact, there is no evidence in the record from which we can conclude that RSC lied. On the contrary, the record is replete with facts that suggest RSC honestly believed plaintiff had falsified drum testing records. It is undisputed that at the time of his termination: (1) plaintiff had a backlog of untested drums (Def.'s LR 56.1(a) Stmt. ¶ 45); (2) he was given two weeks to get the testing done

(id. ¶ 47); (3) when he had not done so by Monday, November 25, 2002, he was given a written warning for failure to follow instructions, substandard work and failure to comply with federal regulations for drum tests (id. ¶ 50); (4) the following day, November 26, 2002, Haskins discovered six QTRs that plaintiff had signed and dated Wednesday, November 27, 2002 (id. ¶ 52); (5) Haskins found four of the six drums that corresponded to the QTRs in the grinding room (id. ¶¶ 55-56); and (6) Haskins, Shah and McGrew all examined the drums and believed that they had not been tested because they were not damaged (id. ¶¶ 57, 59-60, 66-69). Moreover, it is undisputed that plaintiff's union agreed that he had "pre-dated drum tests," which it admitted "could cause serious consequences to [plaintiff] and the Company." (Def.'s LR 56.1(a) Stmt., Tab V(I), McGrew Decl., Att. A, 1/13/03 Letter to McGrew from Sarpolis.)

Because the evidence, at most, suggests that RSC was mistaken about plaintiff's conduct, not that it lied, plaintiff has not raised a genuine issue on pretext. His failure to do so dooms his Title VII termination claim, under either the direct evidence approach or the McDonnell Douglas burden-shifting method of proof. Consequently, RSC's motion for summary judgment on that claim is granted.

In Count II of his complaint, plaintiff alleges that RSC discharged him in retaliation for his refusal to allow defective drums to be shipped to RSC's customers. To defeat RSC's motion on this claim, plaintiff must provide evidence that he was "(1) discharged; (2) in retaliation for his activities; and (3) that the discharge violates a clear mandate of public policy." Sherman v. Kraft Gen. Foods, Inc., 651 N.E.2d 708, 710 (Ill. App. Ct. 1995) (alteration, internal quotation marks and citation omitted). "The element of causation is not met if the employer has a valid basis, which is not pretextual, for discharging the employee." Hartlein v. Illinois Power Co., 601 N.E.2d 720, 728 (Ill.

1992). As discussed above, plaintiff has offered no evidence to suggest that RSC's proffered reason for terminating him, his falsification of the QTRs, is pretextual. Accordingly, RSC is entitled to judgment as a matter of law on plaintiff's state-law retaliatory discharge claim.

In the last count of his complaint, plaintiff alleges that RSC is liable for spoilation of evidence for having lost or destroyed the four drums that corresponded to the disputed QTRs. To prevail on this claim, plaintiff must prove that RSC had a duty to preserve the drums, it breached that duty and that plaintiff had a reasonable probability of succeeding in this suit, but for RSC's destruction of the drums. Boyd v. Travelers Ins. Co., 652 N.E.2d 267, 270-71 & n.2 (Ill. 1995).

Plaintiff says that if the drums had been preserved, they could have been subjected to expert analysis to prove that they had been tested. But such evidence would not be probative of pretext. To prove pretext, plaintiff would have to cast doubt on the veracity of RSC's *belief* that the drums had not been tested. The missing drums could accomplish that task only if they were damaged or showed other obvious signs of having been tested. We can only conclude that they did not, as it is undisputed that plaintiff, his union representative Sarpolis, Shah, Haskins, DeVries and McGrew all examined the drums and none of them, not even plaintiff himself, testified that the drums plainly appeared to have been tested. On the contrary, Haskins, DeVries and McGrew all testified that the drums obviously appeared not to have been tested, a conclusion with which Shah and Sarpolis agreed. (See Def.'s LR 56.1(a) Stmt., Tab IV(C), Haskins Dep. at 70, 79; id., Tab IV(A), McGrew Dep. at 56, 67, 75; id., Tab IV(D), DeVries Dep. at 64-65; id., Tab V(I), McGrew Decl., Att. A, 1/13/03 Letter to McGrew from Sarpolis.) Because plaintiff could have presented evidence about the condition of the drums, even in their absence, he has not created a fact issue on the causation element of his spoilation claim.

## Conclusion

For the reasons set forth above, there is no genuine issue of material fact on any of the claims plaintiff asserts against Russell Stanley Corporation, which is entitled to judgment as a matter of law. Defendant's motion for summary judgment is, therefore, granted. This is a final and appealable order.

ENTER:

_____
UNITED STATES DISTRICT JUDGE

DATED: __JUN 2 1 2004__